Good morning, Your Honors. May it please the Court. I'm Michael Tenenbaum for the Appellants. This case raises a foundational question under our Constitution. It's a question that's never been answered before, and it's a multi-million dollar question because that's the loss that my clients are suffering, as the District Court found, every year, which is irreparable. And the question is this. Does a state, consistent with the free trade principles under the Commerce Clause, have the power to ban a product, a wholesome, unadulterated product, from sale within its borders, not because of any inherent property of the product, not because of any threat to health or safety, but because the state doesn't like the production method by which it was made? And the answer to that question, under the Supreme Court's jurisprudence, in the Extra-Territorial Regulations Do states ban horse meat sales? The reason states ban horse meat is because they want to prolong or preserve the lives of horses, Your Honor. There's no state interest here in prolonging the lives of the ducks. California welcomes all kinds of slaughtered ducks. We don't prize ducks as animals that we can't slaughter. Let me ask you a question. The act in question, in the section you're challenging, was part of legislation that was approved by the Governor in 2004. There was an eight-year delay before the act took effect on July 1, 2012, and your lawsuit was filed a couple days thereafter. What difference, if any, does it make that there was an eight-year period which was designed in part to give producers the opportunity to adjust to the change in the law? I mean, is that significant, insignificant? And what does it mean regarding your issues? And the second question is, as I look at the impact of this statutory change, it appears to apply with equal force to both in-state producers and out-of-state producers. And so I'm having trouble understanding how there is unlawful discrimination under the Dormant Commerce Clause or any other aspect of the Commerce Clause. So I'd appreciate it if you would answer those questions as a part of your argument. Absolutely, Your Honor. The eight-year delay is significant for two reasons. First of all, what the legislature said in the statute, they're going to give eight years so that farmers, agricultural producers they call them, can modify their practices. And California has every right to try to get its own farmers to modify their practices. It can regulate the farming practices for ducks in California. What it can't do constitutionally is project its regulatory regime into New York or Canada or any other state. How has it done that? It's basically said if you follow the eight years, if you say eight years was so that my clients who farmed ducks in New York were required to change their feeding practices, California can't tell farmers in another state to change their feeding practices as a condition of sale in New York. It's like saying we're going to give eight years for people to start paying their employees in other states a higher wage. You don't get to dictate the minimum wage in another state or any other conditions of production. So that's the first way. The second element of the eight-year delay is really telling because what it tells you is that there's no serious concern here for supposed animal cruelty. What kind of interest does the government have in ending cruelty if it says we're going to end the cruelty and we're really serious about it, so we're going to say it's got to end in eight years. If there were serious concerns about animal cruelty, and by the way, New York has significant laws against animal cruelty, thank you very much, just as Canada, there's no reason to put in an eight-year delay if that was the thing. To answer your second question, Your Honor, the statute is silent on the extraterritorial scope of it. There are two provisions here, one of which we're not challenging. California has a section 25981 that bans the force feeding in California, and we all know California could not ban the force feeding in New York or Canada or any other state. It has no power to do that. So what did California do? It passed a second law that said, 25982, which is silent as to whether it applies in the state or to ducks raised outside the state. Well, 25982 states, quote, a product may not be sold in California if it is the result of force feeding a bird for the purpose of enlarging the bird's liver beyond normal size, section 25982, which is the only provision you're challenging, right? That's correct, Your Honor. Okay. That's correct. And in not commenting on where the duck would be fed, that these products are prohibited in the state, the question is, does that apply extraterritorially? Well, first of all, the Supreme Court of California says, in interpreting its own statutes, there's a presumption against extraterritoriality. We don't assume that our state meant to project things into other states because that would run afoul of Commerce Clause, frankly. Secondly, the state argued at the district court level, hey, this ban on sale, it's only there to reinforce the ban on production because there might be some black market producers in California. We want to ban the production and we want to ban the sale of force-fed bird products from birds in California. It doesn't say. They never argued at the district court level, oh, this should apply, and we intend for this to apply to products from ducks that are fed, slaughtered, and turned into food in New York or Canada. And by the way, that's significant because what they're turned into is USDA-approved, wholesome, and unadulterated products that Congress has said in the Poultry Products Inspection Act must circulate unburdened in commerce. I hope that answers your question, Your Honor. Go ahead. So what does the statute do? It attempts to say we've imposed on our own farmers a regulatory regime that prohibits them from using a feeding practice. That's been around for thousands of years, by the way. That was in effect for decades in California, before California banned it, and that California wasn't. Thousands of years.  In fact, Your Honor, I don't know if it's in the record, but there are Egyptian hieroglyphics on the sides of Egyptian tombs showing people, Jewish slaves, frankly, feeding geese to enlarge their livers. And Pliny the Elder writes about it in his writings. How do you know they're Jewish slaves? In Egypt? Is that what you said? They were Jewish slaves in Egypt. The Jews got enough problems without you bringing things like this up. I didn't mean to. How do you know they're Jewish slaves? I'm just going based on what I learned in history. What? I'm just going based on what I learned in history in school, Your Honor. But you learned it where? In school. Where did you go to school? I went to UCLA and to Harvard. But Harvard. Maybe they taught me wrong. You didn't learn it at UCLA. Anyway, it's no matter who the slaves were and what ethnicity they were. But the point is, this is a practice that was going on for decades in California before all of a sudden California said to my clients in New York and Canada, your products aren't welcome here anymore. Why? They're wholesome. They're unadulterated. We want to ban them because we don't like the way you feed your ducks. And imagine we've got a judge from Colorado. Imagine if Colorado passed a law saying, you know what, we're going to switch. We think mechanical milking is so tough on the cows. Do you know they hook the cows up to these machines? So we're going to require in the state of Colorado that all of the cows be hand-milked. Isn't that gentler so the farmer can assess what's going on? And then what we're going to do, though, because we need to level the playing field, is we've got to stop these imports of all these other mechanical milk dairy products because otherwise it's going to be cheaper, it's going to be superior. We need to ban the sale of all milk products in Colorado. What do you do with the rest of the bird? We sell all the rest of the products in California and everywhere else. We should stop from doing that. You can sell the legs, you can sell the eyes, you can sell the toes. Feathers? I'm sorry? You can sell the feathers? Yes, the feathers, the down feathers from our ducks are sold in interstate commerce in California. You can go to Bed Bath & Beyond, and when you buy yourself a down comforter, or go to REI and buy yourself a Patagonia jacket, and that's in the record. So it's only the enlarged liver product that is effective? The statute says, Your Honor, that's one of the vaguenesses here. The statute says a product may not be sold if it's the result of force-feeding a bird for the purpose of enlarging the liver. It does not say a liver product may not be sold. Well, what else comes out of force-feeding? Well, I'll tell you. Duck fat? If you feed a duck extra food, it's going to get fatter. And so you get extra duck fat. If you feed a duck extra food, it's going to grow bigger. Its breasts are going to be bigger. It's going to have a higher fat content. Its legs are going to be bigger. In fact, the only reason we feed our ducks to adulthood, the only way you can get down feathers from a duck or goose is to raise it all the way through adulthood the way we do. So you can take the mature feathers from it and put it into your comforters and put it into your jackets and sleeping bags. So this places a massive burden on interstate commerce. Look, the courts have said from the beginning, including in the Schallenberger case that we cite over 100 years ago, states may not place restrictions on lawful, wholesome products. That's the first thing. It's an extraterritorial regulation to say we're going to try to tell you. I just want to understand the feathers part. Sure. You were saying feathers depend on the force-feeding? Feathers depend on the age of the duck. You can't take baby duck feathers and bring them down. Does the force-feeding prolong the life of the duck? There would be no reason to keep the duck alive unless you were going to feed it in the last couple of weeks. In that sense. So it's not a natural consequence. It's an indirect effect because you aren't using the ducks for foie gras. You'll kill them off, and therefore. The practical effect. That doesn't prevent them from keeping them alive without force-feeding them to generate a profitable business in down feathers. Theoretically, no. But because the feathers constitute such a small part of the duck's value relative to the liver, there is no economic model where you would keep a duck and raise it and feed it at the expense that we feed our ducks, all the way through adulthood, just to take the feathers. So the whole business of down pillows, down feathers, is all dependent on force-feeding. European geese and our ducks, yes, Your Honor. So the point being here, there are two ways that this statute violates the Commerce Clause. One, it attempts to project its agricultural standards, its requirement, without any regard to the health or safety of people in California. It attempts to tell farmers in New York, hey, you need to do this if you want to sell your products here. It's just like what the Supreme Court struck down in the Baldwin case against Seeley. In that case, New York said, listen, if you're going to sell milk in the state, you need to buy it at a certain price because we want to keep the prices high enough for our own suppliers. Make sure they get a good profit for their milk. And then they said, even if your milk comes from Vermont, you can't sell your milk in New York. Well, that's a somewhat different situation where you're putting a – imposing a pricing for it. But I'm interested in are there any cases in which a state – California, for example, has more stringent regulations on auto emissions, for example. There's talk of putting restrictions on toys or products that are sold in countries where the labor conditions are abysmal, like Bangladesh, where the state decides that it does not want to impose the consequence and provide an economic incentive to have products that are generated by an objectionable method. That would be the labor law thing. Or where the impact is, in the case of auto emissions, I understand there's a whole regulatory scheme on that and you get exemptions. But that's the – what's at work here. If you start looking at your argument, what may a state do to regulate its own consumption of product, both the production by its agricultural producers, the duck farmers, and make that applicable to other states indirectly? It's not a direct ban, but it's a consequential ban. I understand your question, Your Honor. I'm also hoping to reserve some of my time, so let me address your question. I was going to hope to reserve four minutes. Well, yeah. And antibiotics, too. Well, let me address that. So cars is a very special example because the Federal Government, Congress, which is the whole point of the Commerce Clause, to reserve interstate commerce issues to the Congress. Congress regulates car emissions, and Congress makes an exception for California for it to have its exceptions, number one. Number two, in terms of the labor conditions, it's very telling what California does, because California does not ban products in the state based on labor conditions, even if they find them deplorable in other states. What it does do, and what it can do constitutionally, to answer your question, is it requires – and if you look at certain companies' websites, it requires a disclosure for them to say, we have investigated the labor conditions in our factories abroad, and we prepared a report on that. But you can't ban those products. Could Washington State, which pays its employees $9.19 for minimum wage, say, how do you people in California live on $8? That's not livable. We're going to ban all the products that result from labor that was only paid – where the workers were paid just a mere $8 an hour. There's a very simple solution to this, by the way, that doesn't require a state banning products. If you're a consumer and you don't – you object to foie gras or any other force-fed product, no one's forcing you to buy that. If you're a consumer and you object to foreign-made products that come from Bangladesh, for that matter, no one's forcing you to buy that. And that's the easy solution here as a matter of the public interest. So I'd like to reserve the balance of my time. I only have now a minute and a half, but I had a few minutes earlier when I was attempting to reserve. Thank you. Good morning. May it please the Court. Stephanie Zook from the Office of the Attorney General on behalf of Appellees. Most statutes that violate the Dormant Commerce Clause do so because of discrimination. So that's an appropriate place to start this discussion. California Health and Safety Code, Section 25982, applies regardless of the origins of the product. It doesn't discriminate versus in-state and out-of-state producers. In fact, the statutory scheme as a whole is harder on California producers because Section 25982 operates in conjunction with an in-state production ban to ensure that in-state individuals cannot produce or sell in California. This simply isn't the kind of economic protectionist legislation that Dormant Commerce Clause jurisprudence focuses on. It's also not. Why is it tougher on the Californians? Because there's another statute that operates to ban production in California, and that's Section 25. They can sell. Can they sell outside? Well, they can't produce. They can't produce at all. Right. They can't produce at all under 25981. Direct. Correct. On them, on the plaintiffs, the appellants, it's indirect consequence, but it's a direct consequence on California producers. Correct. So this isn't a statute that's protecting in-state producers or somehow leveling the playing field because the out-of-state producers, they're right, correct, only regulated indirectly, and that they're only prohibited from making sales in California where the product was the result of force feeding. They can produce however they want, sell however they want outside of California, which, again, goes to the fact that this is not an extraterritorial regulation. This is not like the price control or price affirmation statutes like in Healy where the state is reaching outside of its boundaries and dictating the terms of commerce that occurs elsewhere. California is saying nothing about sales in other states, productions in other states. It just says this is our market, our local market, and we don't want to participate in sales that have to do with animal cruelty. So is there any Dormant Commerce Clause case where this kind of challenge has been rejected? In other words, if we accept your theory, will this be creating new Dormant Commerce Clause language where a state can create a standard? I was searching for an analogy, and counsel properly pointed the weaknesses in my analogies. Are there any precedents where the effect of a local regulation by a large state like California, it's not just some little burg we like to think, has a direct, indirect consequence? And I use that advisedly, direct, indirect, because if California is such a significant market that it, as a practical matter, forces the out-of-state producers to conform to the force-feeding ban that's exacted upon the California producers, is there any parallel precedent? Yes, Your Honor. The United States Supreme Court in Pharmaceutical Research and Manufacturers v. Walsh dealt with a situation where Maine was essentially coercing pharmaceutical companies to enter into favorable rebate agreements with Maine. And the California Supreme Court pointed out that using that kind of leverage, saying you can't participate in our market unless you do so under our terms, is not an extraterritorial regulation. It doesn't violate the Commerce Clause to do that. It has an indirect impact. It's attempting to influence the behavior of other people. But Healy says that in order to be an extraterritorial regulation, you must directly regulate. It's not enough to simply influence or attempt to influence outside of California. The Garrelin reinsurance case is another example where California required out-of-state companies to file information with the insurance commissioner. The hope behind the statute is that that area of commerce is considered much exclusive to the state's insurance. Animal cruelty is also a typical domain for state regulation. And as Your Honor pointed out earlier with Appellant's argument, there are other similar statutes banning, for instance, the sale of horse meat for human consumption that have existed in California and have been upheld by the Seventh Circuit, for instance. That is a traditional area that states can regulate animal cruelty and also say, Well, we're cruelty to the cattle that we slaughter here, aren't we? That's a policy call for the legislature whether or not they want to make a law that applies even-handedly to the production of cattle and sales in state and out-of-state. And chickens. And chickens, correct. That never see the light of day. Yes. The third part of, well, and another thing with an extraterritorial regulation is they also generally occur when a state is regulating an area that has to be regulated on a national level in order to avoid conflicting regulations. This isn't one of those areas. Because it isn't and because there's no discrimination issue, this also isn't an area where pike balancing would be required. National Association of Optometrists and Opticians showed that a substantial burden on interstate commerce is required to even get to the third part of the analysis, pike balancing. And a substantial burden generally results from inconsistent regulation in an area that has to be regulated on a national level. And this is not one of those areas. Well, they're arguing that the major customers for their fat livers are here in California. That's what I thought I heard him say. There was this lot of foie gras eaters in California. Yes, Your Honor. That still isn't the type of substantial, merely impacting commerce is not enough to raise the level of a substantial burden on interstate commerce. A substantial burden generally comes from conflicting regulations like in transportation cases or cases that have to do with national athletics associations that need to be regulated nationally in order to prevent inconsistent regulation. And this isn't one of those areas. Well, how about are we regulating the use of antibiotics that are injected in cattle either in California or elsewhere? Well, it's not a good idea to eat meat from an animal that's been given all these antibiotics that build up resistances and all the rest and have that spread to homo sapiens. Yes, Your Honor, but I think that that raises a good and important distinction with this case. There's a difference between regulating production and saying, for instance, you can't inject cattle with hormones, and that is something that California can only do in-state. California also has the power to regulate sales within its state. It can't tell anyone outside of the state directly how to produce. It can try and use its influence. It can say, I don't want to be complicit in what you're doing, but that's it. And that is the situation in this case. There's no direct regulation of any out-of-state entity. The only direct regulation is with respect to in-state producers and in-state sales. With respect to appellant's due process clause arguments, there's a number of issues with them, but the main simplest way, I think, to get rid of them is that appellants are essentially saying that they engage in the behavior that the statute prohibits. And so under Holder v. Humanitarian Law Project, the court doesn't need to engage in any theoretical discussions about hypothetical issues that appellants don't have. The language of the statute is clear. It prohibits sales of foie gras that are produced through force feeding for the purposes of enlarging the liver. A person of ordinary intelligence, and particularly a person in the business of producing foie gras, knows what the statute prohibits. As the district court rightfully pointed out... Does it use the term foie gras? It uses the term products, but they also must be as... that are the result of force feeding a liver for the purposes of enlarging it beyond normal size. No, Your Honor, that wouldn't qualify. It would have to be an enlarged liver product. Duck fat occurs regardless of whether or not a duck is force fed. Certainly there may be more fat if a duck is force fed, but that doesn't make the product a result of force feeding for the purposes of enlarging the liver. The statute would only cover an enlarged liver product like foie gras. What you're saying, it would have to... It wouldn't even affect a liver if it wasn't a liver that had been... an oversized liver that arose as a result of force feeding. In other words, if a duck ate a feed, for example, let's suppose they have a genetically developed feed that has the effect of enlarging the liver and the feed is scattered in the yard and they eat as much as they want and it does produce an enlarged liver, then it wouldn't even apply to that. Is that correct? That's correct, Your Honor, because as the district court pointed out, the most important and key language in the statute is force feeding, the forcible administration of food, which the statute gives as a particular example, inserting a tube into the esophagus of a duck. If you're not applying force, if you're not using a tube to feed the ducks, which appellants in their declarations admit to doing, and that's why under Holder none of their due process clause claims can succeed, you're clearly in violation of the statute. If you're using a tube, if you're just... if it's a naturally enlarged liver, no, Section 259A2 would not apply. Well, what if some other method were used to enlarge the crop, is that what they call it, of the duck? Whether or not that method would violate the statute and couldn't be sold in California would depend on whether or not there was force. So if Your Honor is suggesting just some sort of genetic modification of the duck or having ducks that are suited for gorging themselves, no, that would not violate the statute. That's not using force. That's not using a tube. It's not of a like kind that the legislature pointed out as an example of force feeding. If there are no further questions, I will submit. Okay. Thank you. Thank you. Thank you. If it pleases the Court, my name is Melissa Grant, and I am counsel for the Amici. The Amici were the supporters and sponsors of this legislation, were very involved in its creation and enactment. And one of the --- We've added you status. You better use your five minutes on merits. Okay. Well, one of the reasons I said that is because the statute is not vague. The statute says that it prohibits the sale of a product in California if it is the result of feeding a bird for the purpose of enlarging the bird's liver beyond its normal size. Now, the term, the result of, is very important. As the Court observed in the central district, the case of Estate v. Kalahashi, the result of suggests a limitation on the chain of causation. You do not have to force feed a duck through a tube in this very inhumane fashion in order to create duck fat, duck feathers, duck breast, et cetera. They are not the result of the process of force feeding a liver. In addition, Your Honor asked before whether there was any precedent for a State banning, because of cruelty, an entire industry or market. And there is. There is a case called Crescenzi v. Bird Importers v. the State of New York. This is a case where they banned the- Is that cited in your brief? Yes, it is. It's a case where they banned wildlife birds, the importation, because of the cruel and inhumane way of capture. And the Court said, citing to the U.S. Supreme Court case of New York X-Rail Sills v. Hesterberg, that New York has a legitimate interest in regulating its local market conditions, which lead in short causal chain to the unjustifiable and senseless suffering and death of thousands of captured wild birds. This is a New York case? This is a New York case. The United States Supreme Court case was a case dealing with the ban on importing game during off-season for gaming, and the law banned that act. And the United States Supreme Court recognized that a state has the right to legislate in a way that affects wildlife and animals in other states for the interest of preventing animal cruelty or whatever interest that it legitimately has. Appellant does not question the legitimate interest a state has in barring animal cruelty. He concedes that. And if you were, although we agree with the state that pike balancing is not necessary because a substantial burden on interstate commerce has not been shown, if you were to reach to that, the Ninth Circuit case of Pacific Northwest Venison establishes that this the Court is not to replace the judgment of the legislature as to what is in the public interest. And it's the legislature who is to decide what risk the state will assume in terms of the method it picks for effectuating the public interest. And the public interest here is stopping forced feeding. And the only way to do that is to stop the marketplace for it. The state does not need to participate or be complicit as the Attorney General pointed out. And Pacific Northwest Venison speaks to the balancing of that right. In addition, the California Penal Code has numerous statutes where we have banned the importation of various animals and animal products. For example, 693.0 or 0 of the Penal Code bans kangaroo products unless they comply with the Australian rules. Now, how do you tell what a kangaroo product is if it, whether or not it complied with an Australian rule? But we have done that, and that is consistent with due process, and it's consistent with the Commerce Clause. And now I just would like to ask the Court if it had any specific questions. Thank you. Okay. Thank you. Thank you. In the timekeeping, I just want to, did the State get 10 minutes or 15? I'm just trying to make sure we're equal here. Don't worry about it. Just talk. Okay. Thanks. Our challenge to this statute is not based on discrimination. There is discrimination in the market for duck breasts. But that's not the focus of our challenge, so it's misleading to suggest that. So what is it? It's two things. Number one, this statute. Is this a direct? It regulates extraterritorially. Directly? Yes. Here's how it does it. It says to farmers in other states, like the State says, you can do whatever you want in those other states. You just can't sell your products in ours. But it's not regulating. It's an indirect regulation. It's conditioning the sale of a product in this State entirely on conduct outside the State, not on the characteristic of the product. What's the closest case you have? Well, I'll tell you an excellent case on this, Your Honor. Good. Judge Fischer's opinion in Conservation Force v. Manning, where the Court said specifically. That was hunting. That was hunting. That's true. So it involves animals. But here's what the Court said. The Commerce Clause was included in the Constitution to prevent State governments from imposing burdens on unrepresented out-of-State interests, like my Canadian and New York clients, merely to assuage the political will of the State's represented citizens. Well, look, Counsel, when you read a sentence out of context, look at the Meyer case, the San Francisco case where I was on the panel, and Judge Wallace described what our rules are on Dormant Commerce Clause. So selectively quoting out of opinions doesn't help you. How does that case translate to the facts of this case? In two ways. Here's the principle. The Supreme Court has recognized, as recently as a week ago, actually, as recently as a week ago in McBurney v. Young, the common thread among those cases in which the Court has found a Dormant Commerce Clause violation, it doesn't say anything about discrimination, is that the States interfered, this is a quote, interfered with the natural functioning of the interstate market, either through prohibition or through burdensome regulation. This is a prohibition. This is a ban, a total ban on products that result from ducks that are fed in a particular way. And it violates the Commerce Clause in two ways. One, it projects its regulatory regime for the feeding of ducks into other states. Now, it can't. No California sheriff can go into New York and arrest or cite my farmers. So it knows it can't do that. So the way it does is the way all the extraterritorial regulation cases work. Baldwin v. Seeley. Or take Hunt. Hunt is a Supreme Court case where North Carolina said you can't sell your apples, you can sell your apples anywhere you want, all the other 49 states, but if you want to sell them in North Carolina, you're going to have to remove your grading. Your Washington State grade labels, you've got to take them off or come up with some new crates. And the Supreme Court said you can't do that. That places a burden on these people you're trying to project your regime outside the state. So, first of all, it regulates extraterritorially, and the extraterritorial regulation jurisprudence of the Supreme Court says. What if you're dealing with cruelty to animals, which is what the assertion is here? Address that, because that's the second test under the Commerce Clause. Commerce Clause recognizes even when there's no discrimination, when a statute is even-handed, you need to look at the burden of that statute has to be substantial and compare that with the legitimate local interest. We concede only that the state of California has a legitimate local interest in preventing animal cruelty within its borders. It doesn't have a legitimate local interest. What if a state, say, decided to employ child labor, particularly the child labor of children from poor families? Then California said, we don't want those products in here. It violates principles of decency and humanity and all the rest. Sure, that's a good question, Your Honor. What about that? Over 100 years ago, before the modern dormant Commerce Clause jurisprudence of the Supreme Court and of the circuit, states tried to do that, and Congress said, no, this is not a matter that we want states, because one state says it's cruel for a 12-year-old to work, and another says, no, no products that result from an 8-year-old and no from a 15-year-old. Congress said, we have the power because it's an interstate commerce issue, and the Constitution reserves to us the power to make those restrictions on bans of products from one state to another based on those concerns. So you said you concede. I thought you had said at the outset of your argument that California did not have an interest, sufficient interest, excuse me, in cruelty to animals because ducks can be slaughtered and everything else. Now you say you do concede that, but what don't you concede? Financial burden? No, I wanted to finish my sentence on that. I'm sorry, Justice Breyer, for interrupting. But the question is only that we concede that California has a legitimate local interest, which is the test under Pike balancing, in banning animal cruelty to these sentences. It's not cruel for a million reasons, I can tell you, but including in the statute itself. Just answer the question. Sorry. They cannot, they can regulate animal cruelty within the borders. But California has no power. We do not concede that it's a legitimate local interest under Pike balancing for California to tell New York farmers how to treat their animals. Okay. So you're basically, so it's a substantial burden, are you? It's a substantial burden. Okay. Why don't you just say so? But it's a substantial burden. On the other side of the balance, there's no legitimate local interest. Right. Okay. Sorry. My gosh. But where is there no substantial local interest? Because the interest, California's interest, as applied, this is only as applied to my out-of-state clients. Yeah. As applied to the farmers in New York and Canada, it is not a legitimate interest to tell them how to raise their ducks when they have their own animal cruelty laws. And it's certainly not local. What business is it of California to say, New Yorkers, we don't like how you treat your ducks? California said, we don't want meat coming into our state where this particular product is a result of cruelty to animals. But that's not what they say here. They allow the meat. They allow you to force-feed a duck and sell all the products here. You just can't force-feed it for enlarging the liver. You can sell the states as you can sell the place. That's why the cruelty goes on, because they run those tubes down, and they force-feed the ducks. And they only do it for one purpose, is to enlarge the liver. But what the state says is, if we sell that liver to somebody in any of the 49 states, we can sell the force-fed duck breast, we can sell the force-fed duck legs, which are bigger, and the result is the same. Now you're saying because it's limited, it's objectionable? If you take the state's position, it's nonsensical. No, it isn't. Okay. Thank you, counsel. I think we have your argument, and you've had your time. Okay. Thank you very much. Okay. All right. This one's submitted, too.
judges: Daniel, Pregerson, Fisher